UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3/31/14

-------------------------------------------------------------x

DAVID WITT and KINUYO GOCHAKU WITT,

                                 Plaintiffs,

          - against -

THE VILLAGE OF MAMARONECK, THE
VILLAGE OF MAMARONECK PLANNING
BOARD and ROBERT MELILLO, individually
and in his official capacity as the Building
Inspector,

                                 Defendants.

-------------------------------------------------------------x

**<u>OPINION AND ORDER</u>**

12-cv-8778-ER

Ramos, D.J.:

        This case arises out of the efforts of a Westchester County couple to repair their home

after it was rendered uninhabitable by Hurricane Irene.  Plaintiffs David Witt and Kinuyo

Gochaku Witt (together, "Plaintiffs") are residents of the Village of Mamaroneck (the "Village")

who purchased their home in April 2009.  Less than three years later, Hurricane Irene caused the

Mamaroneck River to overflow, flooding Plaintiffs' home and causing substantial damage.  Then

followed a series of events, described in detail below, that prevented Plaintiffs from successfully

completing the necessary repairs:  they were initially issued a building permit but subsequently

received a verbal stop-work order, after which they were required to seek a variance exempting

them from certain local land use requirements.  The end result was that Plaintiffs ran out of

money to complete repairs, defaulted on their mortgage, and had foreclosure proceedings

brought against them.

        Plaintiffs bring suit, pursuant to 42 U.S.C. § 1983 ("Section 1983"), against the Village,

the Village of Mamaroneck Planning Board (the "Board") and Building Inspector Robert Melillo

("Melillo") (collectively, "Defendants").  Doc. 4.  Melillo is named both individually and in his official capacity.  *Id.*  Plaintiffs allege causes of action for equal protection, substantive due process, and procedural due process violations, along with a *Monell* claim against the Village.[1] *Id.*  They also seek punitive damages from Melillo.  *Id.*  The gravamen of Plaintiffs' claims is that Defendants enforced arbitrary and burdensome legal requirements with respect to their repair efforts that had not been imposed on similarly situated homeowners.  Presently before the Court is Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Doc. 8.

For the reasons discussed below, Defendants' motion to dismiss is GRANTED.

## I.  Factual Background

The following facts are based on the allegations in the Amended Complaint, which the Court accepts as true for purposes of the instant motion.  *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010).

Plaintiffs purchased their home for $366,500 in April 2009.  Am. Compl. ¶¶ 14, 16.  The home consisted of two stories and an unfinished basement.  *Id.* ¶ 26.  It was located across the street from the Mamaroneck River; there were homes on the other side of the street with backyards abutting the river.  *Id.* ¶ 17.

In August 2011, the Village issued an evacuation notice in anticipation of Hurricane Irene.  *Id.* ¶ 23.  Plaintiffs evacuated, but their home—like most homes in the neighborhood—

---

[1] The Amended Complaint also includes state law causes of action for negligence and tortious interference with property rights, along with *respondeat superior* claims against the Village.  Am. Compl. ¶¶ 157-68.  In responding to Defendants' motion to dismiss, however, Plaintiffs have withdrawn the state law claims.  Pls.' Mem. of Law in Opp'n at 43 n.16 ("Plaintiffs withdraw their supplemental claims based solely on state law.").

suffered severe flood damage when the river overflowed.  *Id.* ¶¶ 23-25.  The flooding reached the first floor of the home, and the resultant damage rendered it uninhabitable.  *Id.* ¶¶ 26-27.

Plaintiffs applied for a building permit on September 29, 2011.  *Id.* ¶ 34.  The process was delayed because Plaintiffs' flood insurance carrier required that an engineering inspection be performed before the claim could be processed, thus preventing them from hiring a contractor to begin repairs.  *Id.* ¶ 35.  Once the inspector's report was filed, Plaintiffs' contractor submitted plans for review by the Village's Building Department.  *Id.* ¶ 37.  The Village approved the building permit on November 29, 2011, by which point Plaintiffs' neighbors has "substantially completed" their own repairs.  *Id.* ¶¶ 40-41.

Work on Plaintiffs' home began on December 5, 2011 and continued for four weeks, during which time the Village conducted three inspections of the property without incident.  *Id.* ¶¶ 43-44.  The entire project was expected to take eight to ten weeks and cost approximately $115,000.  *Id.* ¶ 38.  After the first four weeks, with approximately fifty percent of the repair work having been completed, Melillo visited the site and subsequently issued a verbal stop work order to Plaintiffs' contractor.  *Id.* ¶¶ 45, 48-49.  He did not provide an explanation or issue a written order stating the grounds for halting the project.  *Id.* ¶ 50.  Shortly thereafter, however, Melillo spoke to David Witt and indicated that he had issued the order because Plaintiffs' building permit had been issued in error.  *Id.* ¶ 51.

Melillo informed Plaintiffs that he was deeming their repair work to be a "substantial improvement" under Chapter 186 of the Village Code.  *Id.* ¶ 56.[2]  In relevant part, the code defined "substantial improvement" as follows:

_____

[2] Both the Amended Complaint and Plaintiffs' brief refer to "Section 186," but the Court notes that the Village Code designates the subdivision in question "Chapter 186."  The Court will therefore refer to "Chapter 186" throughout

> Any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50% of the market value of the structure before the start of construction of the improvement. Substantial improvement also means "cumulative substantial improvement." The term includes structures which have incurred substantial damage, regardless of the actual repair work performed.

*Id.* ¶ 57.[3] If a home was located in a flood plain, sustained "substantial damage" and required repairs that the Building Inspector deemed to be a "cumulative substantial improvement," the owners were required to reconstruct and elevate the foundation unless they obtained a variance from the Board. *Id.* ¶ 58. Though not discussed in any detail in the Amended Complaint, the apparent effect of Chapter 186 on Plaintiffs was that, by requiring the foundation to be elevated, the cost to repair the home was increased to an amount that Plaintiffs could not afford. The Board was authorized to grant variances upon (1) a showing of good cause, (2) a determination that the applicant would suffer exceptional hardship if the variance was not granted, and (3) a determination that the variance would not lead to increased flood heights, additional public safety threats, extraordinary public expense, nuisances, fraud on or victimization of the public, or conflicts with existing laws. *Id.* ¶ 63.

Initially, Melillo told David Witt that Plaintiffs needed to obtain a New York State variance prior to making their application to the Board. *Id.* ¶ 64. A state official, however, indicated that she did not think the repairs fell within Chapter 186's definition of "substantial improvement," such that a state variance would not be required. *Id.* ¶¶ 65-66. A site visit in late January 2012 confirmed that Plaintiffs did not need a state variance. *Id.* ¶ 67.

---

this Opinion. Article I of that chapter, which contains sections 186-1 through 186-6, is entitled "Flood Damage Prevention." The current version of the Village Code is available at http://www.village.mamaroneck.ny.us/Pages/ MamaroneckNY_WebDocs/code.

[3] Chapter 186 was amended in September 2012, and the "cumulative substantial improvement" provision was removed. Am. Compl. ¶ 59.

Melillo rejected Plaintiffs' offer to limit the work being done on their home so that the cost would not qualify as a "substantial improvement." *Id.* ¶ 71.  When asked why the other residents in the neighborhood had been able to complete their repairs without a permit or a variance, Melillo told Plaintiffs that those residents had performed the work illegally or failed to file for permits, adding that Plaintiffs were "being punished for doing the right thing." *Id.* ¶¶ 72-73 (internal quotation marks omitted).  Days later, Melillo informed David Witt that he had spoken to the Board and that Plaintiffs would "have a hard time getting this variance." *Id.* ¶ 76 (internal quotation marks omitted).

Plaintiffs submitted their variance application on January 27, 2012 and made a mandatory $2,000 escrow deposit to cover the Board's consultant fees. *Id.* ¶ 78.  They also spoke with Village Manager Richard Slingerland, asking him why no other homes on their block had been required to obtain a variance. *Id.* ¶ 79.  Slingerland told them that the other homes had obtained permits but that the work had been performed illegally and the Village was taking corrective measures. *Id.*

On February 6, 2012, Plaintiffs attended a meeting with Melillo and the Board's consultant, Susan Favarte. *Id.* ¶ 80.  Favarte indicated that Plaintiffs would be eligible for a variance on the basis of hardship, but Melillo again indicated that it would be difficult for them to obtain a variance, explaining that he was "getting beat up by all these agencies and [the Federal Emergency Management Agency ("FEMA")]." *Id.* ¶¶ 81-82 (internal quotation marks omitted).

Plaintiffs appeared before the Board on February 8, 2012. *Id.* ¶ 85.  At the meeting, the Board's attorney told the Board that their decision could have ramifications because "other agencies" were monitoring the Village and the way it was handling Chapter 186. *Id.* ¶ 90.

Plaintiffs were told to submit a Floodplain Development Permit Application and to meet with Melillo and the Village Engineer to identify the specific code sections from which they were requesting a variance.  *Id.* ¶ 92.  Melillo initially told them to apply for a variance from Chapter 186 in its entirety, but he subsequently contradicted this instruction and provided them with a written list of specific variances to request.  *Id.* ¶¶ 93, 95.  Plaintiffs did so, and the Board considered their application at a special meeting on February 15, 2012.  *Id.* ¶¶ 97, 98.  The Board's tone at the meeting was "antagonistic," with members expressing concern for future owners of the home but not for the hardships Plaintiffs were currently facing.  *Id.* ¶ 99.  The Board ultimately approved the variance with conditions that made subsequent purchasers responsible for elevating the foundation and required Plaintiffs to add notice of this restriction to the deed.  *Id.* ¶ 101.  At the same meeting, Melillo told Plaintiffs that certain variances still had to be obtained from New York State, a four- to six-month process.  *Id.* ¶ 102.  The Board voted on the variance at the end of that meeting and formally adopted it at a meeting held the following week.  *Id.* ¶ 103.

By this point, Plaintiffs had run out of money to pay for the necessary repairs or to pay their mortgage.  *Id.* ¶ 105.  They defaulted on the mortgage, foreclosure proceedings commenced, and their credit was ruined.  *Id.*

Plaintiffs filed suit on December 4, 2012 and amended their Complaint on February 15, 2013.  Docs. 1, 4.  They allege that, after ignoring other homeowners' unauthorized and non-compliant repair work, Defendants selectively enforced Chapter 186 against them in order to convince state and federal authorities that the Village was remedying its past failure to enforce

flood-zone regulations.  Am. Compl. ¶ 116.[4]  Melillo allegedly told Plaintiffs that their variance

was delayed, in part, because FEMA was conducting an audit and Plaintiffs' property was the

claim being used to demonstrate how the Village handled variance applications.  *Id.* ¶ 119.[5]

According to Plaintiffs, they were singled out because they "lacked the local ties and political

influence of many other homeowners,"[6] and because of their delayed repair schedule.  *Id.* ¶¶ 120,

122.

Defendants ask the Court to dismiss the Amended Complaint in its entirety.  Doc. 8.

## II.    Ripeness Analysis Under Rule 12(b)(1)

Defendants' threshold argument in favor of dismissal is that Plaintiffs' federal claims are

not ripe to the extent they are based on Melillo's stop work order or his determination that a

variance and/or a floodplain permit was required.  *See* Defs.' Mem. of Law in Supp. at 2-4.

Because ripeness is a jurisdictional issue, it is properly considered under Rule 12(b)(1).  *See*

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294 (S.D.N.Y.

2003).

### A.  Legal Standard

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of

subject matter jurisdiction when the district court lacks the statutory or constitutional power to

adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction

---

[4] The Village is required to have certain laws in effect, and to demonstrate enforcement of them, in order to participate in the National Flood Insurance Program.  Am. Compl. ¶ 117.  Because of the Village's history of non-compliance, FEMA had refused to approve the Village as an administrator of flood grants.  *Id.* ¶ 118.

[5] A prior allegation suggests that this alleged statement by Melillo was false.  *See* Am. Compl. ¶ 108.

[6] The Amended Complaint further alleges that these politically connected homeowners "placed considerable political pressure on Village officials to take whatever steps were necessary to get public flood repair monies flowing."  Am. Compl. ¶ 121.

carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists.
*Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v.
United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  On a Rule 12(b)(1) motion challenging the
district court's subject matter jurisdiction, evidence outside of the pleadings, such as affidavits,
may be considered by the court to resolve the disputed jurisdictional fact issues.  *Zappia Middle
E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Morrison*,
547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).  When evaluating a motion to dismiss for
lack of subject matter jurisdiction, the court accepts all material factual allegations in the
complaint as true, but does not draw inferences from the complaint favorable to the plaintiff.  *J.S.
ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs.
Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998)).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the court must
consider the Rule 12(b)(1) motion first.  *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820
F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd sub nom. Baldessarre ex rel. Baldessarre v.
Monroe-Woodbury Cent. Sch. Dist.*, 496 F. App'x 131 (2d Cir. 2012).

### B.  Discussion

The "basic rationale" for the ripeness doctrine "is to prevent the courts, through
avoidance of premature adjudication, from entangling themselves in abstract disagreements."
*Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano
v. Sanders*, 430 U.S. 99 (1977).  In *Williamson County Regional Planning Commission v.
Hamilton Bank*, 473 U.S. 172 (1985), the Supreme Court set forth specific ripeness requirements
for land use disputes.  The Court held that a Fifth Amendment Takings Clause claim was not ripe
because the respondent had neither (1) obtained a "final decision" from the relevant state

8

regulatory authority nor (2) sought just compensation from the state. *Id.* at 186. While the latter requirement is unique to the Takings Clause context, the former has since been applied to equal protection and procedural and substantive due process claims. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88-89 (2d Cir. 2002); *Hunter v. Town of Chili*, No. 09-CV-6285, 2010 WL 598679, at *2 n.3 (W.D.N.Y. Feb. 18, 2010). Before proceeding to the merits of Plaintiffs' claims, therefore, the Court must determine whether the challenged conduct satisfies *Williamson*'s finality requirement. The Court concludes that it does.

While Plaintiffs sought—and were granted—a variance, nothing in the Amended Complaint suggests that they appealed any of Melillo's determinations in the first instance.[7] Plaintiffs do not argue otherwise in briefing the issue. *See* Pls.' Mem. of Law in Opp'n at 17-19. However, the finality requirement does not mandate that a party exhaust its administrative remedies prior to bringing a federal claim. *Williamson*, 473 U.S. at 192-93. The Supreme Court has explained the distinction between finality and exhaustion as follows:

> While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Id.* at 193.

The very fact that Plaintiffs obtained a variance from the Board highlights that the finality requirement has been satisfied in this case. The Second Circuit has identified four considerations underlying *Williamson*'s holding: (1) requiring a final decision aids in developing a full record;

---

[7] Chapter 186 provides that the Board "shall hear and decide appeals when it is alleged there is an error in any requirement, decision, or determination made by the local administrator in the enforcement or administration of this article." Village Code § 186-6(A)(2). The Building Inspector falls within the definition of "local administrator." *Id.* § 186-2.

(2) a final decision allows a court to "know precisely how a regulation will be applied" to the property in question; (3) the property owner may obtain the desired relief without the need for judicial resolution of constitutional questions; and (4) land use disputes are better resolved at the local level if possible. *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348-49 (2d Cir. 2005). None of these concerns is implicated in this case. To the contrary, the Board has already reached a determination clarifying precisely how Chapter 186 will apply to Plaintiffs' property—the floodplain regulations will be waived with respect to Plaintiffs' desired repairs as long as Plaintiffs comply with the stated conditions of the variance. That Plaintiffs could have pursued an alternative avenue—an appeal of Melillo's initial determinations—at an earlier stage of the process does not affect the *current* status of their claims. In other words, Plaintiffs may not have exhausted every avenue available to them along the way, but *Williamson* does not demand that they do so. The failure to appeal may have rendered Plaintiffs' claims unripe had they been brought *prior to* having pursued the variance,[8] but there is nothing in the record indicating that the current state of affairs with respect to Plaintiffs' property is anything less than final. *See Murphy*, 402 F.3d at 348 (noting that the finality requirement "conditions federal review on a property owner submitting at least one meaningful application for a variance").

Melillo's actions and determinations with respect to Plaintiffs' repair work are therefore final and subject to review by this Court. To hold otherwise merely because Plaintiffs did not previously appeal those determinations to the Board would be to improperly impose an

---

[8] Defendants' ripeness challenge, and both parties' briefing of the issue, focuses on whether Melillo's conduct, viewed in isolation from the subsequent variance application, itself represented a final decision. *See* Defs.' Mem. of Law in Supp. at 2-4; Pls.' Mem. of Law in Opp'n at 17-19; Defs.' Reply Mem. of Law in Supp. at 1-3. The Court declines to bifurcate the ripeness inquiry in this way.

exhaustion requirement as part of the ripeness analysis.  To the extent Defendants bring their motion under Rule 12(b)(1), that motion is denied.

## III.   Failure to State a Claim Under Rule 12(b)(6)

### A. Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Famous Horse Inc.*, 624 F.3d at 108.  However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Id.* at 678-79.  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

### B.  Discussion

#### i.  Equal Protection

Plaintiffs' first cause of action alleges a violation of the Fourteenth Amendment's Equal Protection Clause.  Am. Compl. ¶¶ 127-132.  The claim is rooted in Plaintiffs' contention that they were treated differently from their neighbors, both in Defendants' initial application of Chapter 186 to Plaintiffs' repair work and in their imposition of variance conditions.  *Id.* ¶¶ 128-29.

Because Plaintiffs do not claim to be members of a constitutionally protected class, they may bring their equal protection claim pursuant to one of two theories:  (1) selective enforcement, or (2) "class of one."  In their opposition papers, Plaintiffs indicate that they are relying on both theories.  Pls.' Mem. of Law in Opp'n at 19.  The Court therefore analyzes the sufficiency of the pleadings under each.

#### a.  Threshold Inquiry:  Allegations That Comparators Were "Similarly Situated"

Plaintiffs are required to allege differential treatment from "similarly situated" individuals in order to state a viable equal protection claim under either theory.[9]  *See, e.g.,*

---

[9] There is disagreement within the Second Circuit regarding the degree of similarity that a plaintiff must show in order to adequately allege an equal protection claim under the selective enforcement theory.  *See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693-97 (S.D.N.Y. 2011) (discussing the alternative standards and surveying the disagreement among courts in this Circuit).  The Court of Appeals has made clear that, in a "class of one" case, "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). That is because, in such cases, similarity "is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain."  *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (per curiam).  The disagreement within the Circuit is over whether selective enforcement cases require the same high degree of similarity, or whether a "slightly less stringent" standard applies wherein plaintiffs must show that the comparators are "similarly situated in all material respects."  *Mosdos*, 815 F. Supp. 2d at 696 (internal quotation marks omitted) (quoting *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008)).  The Court is not required to determine which standard should

*Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) (affirming

dismissal of a "class of one" claim based on plaintiffs' failure to adequately allege that

comparators who were "sufficiently similar" to plaintiffs were treated more favorably); *Church*

*of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) ("A selective

enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated

differently compared to others similarly situated.").  Because Plaintiffs fail to satisfy this

threshold requirement, their equal protection claim must be dismissed.

Plaintiffs allege that their home "was similar in size, style, and value to neighboring

homes" and that many of these "similarly sized and valued homes experienced comparable

damage" after Hurricane Irene.  Am. Compl. ¶¶ 15, 72.  Such allegations, standing alone, are too

conclusory to satisfy *Twombly*'s plausibility standard.[10]

Elsewhere in the Amended Complaint, Plaintiffs provide more specific allegations about

three nearby properties that "sustained cumulative damage from Hurricane Irene and prior

flooding incidents comparable to that sustained by Plaintiffs' home."  *Id.* ¶¶ 112-15.  Plaintiffs

provide street addresses for all three and repair costs for two of the three.  *Id.* ¶¶ 113-15.  Only

---

be applied to the selective enforcement claim in this case because the allegations in the Amended Complaint fail to
satisfy either.  *See Gentile v. Nulty*, 769 F. Supp. 2d 573, 580-81 (S.D.N.Y. 2011) (noting disagreement as to the
meaning of "similarly situated" but declining to decide which standard to apply where plaintiff's claim would fail
under any standard).  Since Plaintiffs fail to adequately plead that the comparators are similarly situated in all
material respects, it follows *a fortiori* that they have not met the higher threshold applicable to "class of one" claims.

[10] Plaintiffs argue that the "similarly situated" inquiry is a factual issue inappropriate for resolution on a 12(b)(6)
motion.  *See* Pls.' Mem. of Law in Opp'n at 20.  However, the Second Circuit has made clear that claims regarding
the existence of comparators must be supported by facts rendering those claims plausible.  *See Ruston*, 610 F.3d at
58-60 (applying *Twombly* and *Iqbal* in evaluating whether plaintiffs adequately pled the existence of similarly
situated comparators); *see also Mosdos*, 815 F. Supp. 2d at 697 n.10 ("[P]ursuant to *Ruston*, Plaintiffs must allege
specific facts that suggest that it is plausible that the given comparators are similarly situated to Plaintiffs under
whatever may be the appropriate standard for similarity . . . ."); *Toussie v. Town Bd. of Town of E. Hampton*, No.
CIVA 08-1922 DRH WDW, 2010 WL 597469, at *6 n.3 (E.D.N.Y. Feb. 17, 2010) ("*Twombly* and *Iqbal* require
sufficient factual allegations to make the conclusion of similarly situated plausible.").

one, however, is specifically alleged to have incurred those costs as a result of the hurricane.  *See id.* ¶ 113.  Plaintiffs allege that one of the others was repaired "during the period between a 2007 flooding event and Hurricane Irene," and that the third "undertook substantial improvements between 2007 and 2011."  *Id.* ¶¶ 114-15.

Timing is of crucial significance to Plaintiffs' equal protection claim.  The crux of their complaint is that Defendants improperly singled them out for enforcement of the floodplain regulations in response to pressure from FEMA and other agencies.  *See id.* ¶ 130.  But Plaintiffs admit that, due to unavoidable insurance-related delays, they did not obtain their permit and begin repairs until their neighbors "had already substantially completed the repairs to their flood-damaged homes."  *Id.* ¶¶ 41-42; *see also id.* ¶ 122 (identifying Plaintiffs' "delayed repair schedule" as a factor leading to the alleged disparate treatment).  There is, therefore, a temporal gap in the timeline Plaintiffs present.  The Court cannot take the position that, just because a local government has failed to enforce its regulations in the past, it has forever waived the ability to begin enforcing them in the future.  In other words, there is nothing inherently wrongful in Defendants' deciding to respond to external pressures by enforcing existing regulations; an equal protection claim will only lie if Defendants engaged in selective enforcement *at that point*.  As Plaintiffs acknowledge, the Village enhanced its enforcement activity in response to pressure from FEMA post-Hurricane Irene.  Thus, in order to demonstrate that their neighbors were similarly situated in all *material* respects, Plaintiffs must identify comparators who were undertaking repairs concurrently, subsequently, or at least within sufficiently close temporal proximity so as to suggest that a proper comparison may be drawn for purposes of the equal protection analysis.  *See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d

14

679, 698-99 (S.D.N.Y. 2011) (considering the relative timing of project approvals as a relevant factor in assessing the adequacy of the pleadings).[11]

Finally, the Amended Complaint itself belies any argument that similarly situated comparators exist with respect to the allegedly "unprecedented" variance conditions. Am. Compl. ¶ 129. The pleadings expressly allege that Plaintiffs' neighbors were not required to pursue a variance at all. *See id.* ¶ 104 ("Planning Board minutes . . . show that Plaintiffs were the only homeowners in the Village of Mamaroneck required to seek a variance to the requirements of [Chapter] 186 in the wake of Hurricane Irene . . . ."). Plaintiffs cannot, therefore, claim disparate treatment based on the *outcome* of their variance application.[12]

### b. Selective Enforcement

Even if Plaintiffs had sufficiently alleged that their neighbors were similarly situated, their selective enforcement claim would fail. In order to state a viable equal protection claim under this theory, a plaintiff must show that:

---

[11] The two pre-Irene comparators are clearly inapposite on this basis. Even if Plaintiffs were to allege that the other property's post-Irene repairs occurred within the applicable timeframe, the Court notes that there are other deficiencies in the pleadings with respect to that property. First, although Plaintiffs provide a street address and a conclusory statement that it was "located near Plaintiffs' home," Am. Compl. ¶¶ 112-13, nothing in the description of the property indicates whether it was located in a floodplain such that Chapter 186 was applicable to it. Likewise, Plaintiffs do not offer any allegations regarding the property's value relative to their own, a necessary factor in determining whether the repair costs would have triggered the "substantial improvement" regulations. Instead, Plaintiffs merely assert that this allegedly similar property "was not subjected to a Village Code 186 determination that cumulative repairs constituted a 'substantial improvement' or required to seek a variance." *Id.* ¶ 113. But that assertion begs the question of whether the regulations were applicable to the property at all. Without allegations establishing Chapter 186's applicability to a particular property, the Court is unable to conclude that Plaintiffs have plausibly alleged the existence of similarly situated third parties.

[12] The Amended Complaint does reference a variance application for a home "located down the block" from Plaintiffs' property. Am. Compl. ¶ 74. However, the pleadings are devoid of details concerning the timing or circumstances of this application. Given the express statements elsewhere in the Amended Complaint, which indicate that no other homeowners were required to obtain variances following Hurricane Irene, the Court is unable to draw any reasonable inferences in Plaintiffs' favor based on this isolated reference.

15

> (1) [he], compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the [plaintiff].

*Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)).[13]

Here, nothing in the Amended Complaint suggests that Plaintiffs are even attempting to allege that Defendants were motivated by impermissible discriminatory considerations or a desire to punish or inhibit Plaintiffs' exercise of their constitutional rights. In order to state a claim, then, Plaintiffs need to have alleged that Defendants acted with a malicious or bad-faith intent to injure them. The Amended Complaint does no such thing. In fact, the pleadings do not suggest that Defendants were motivated by any feelings toward Plaintiffs at all; instead, the alleged selective enforcement is said to be premised on pressure to conform to FEMA's expectations in order to obtain flood money for the Village.[14] Plaintiffs' own brief drives this point home. *See* Pls.' Mem. of Law in Opp'n at 23 ("It is alleged that Defendant Melillo's personal reaction to criticisms from FEMA and other agencies . . . was the driving force behind

---

[13] Plaintiffs mistakenly rely on *Petruso v. Schlaefer*, 474 F. Supp. 2d 430, 439 (E.D.N.Y. 2007), for the proposition that a selective enforcement claim can be based either on ill will or the absence of a rational basis. *See* Pls.' Mem. of Law in Opp'n at 22. *Petruso*, however, was speaking in generalized terms about the possibility that an equal protection claim can be alleged under either the selective enforcement or the "class of one" theory. As the surrounding discussion makes clear, the court was not articulating the selective enforcement standard, but rather was alluding informally to the alternative showings that would suffice to state an equal protection claim under one of the two theories. To the extent that Plaintiffs argue that the Amended Complaint alleged arbitrary or irrational conduct, those arguments are inapposite for purposes of the selective enforcement analysis.

[14] In their brief, Plaintiffs make much of the allegation that Melillo allegedly told them that they were "being punished for doing the right thing." *See* Pls.' Mem. of Law in Opp'n at 23 (citing Am. Compl. ¶¶ 71-73). Common sense dictates that, even if Melillo made the alleged statement, he did not literally mean that he was attempting to "punish" Plaintiffs. The colloquial meaning of the phrase is self-evident, and the Court therefore declines to attribute any weight to the allegation insofar as it is intended to suggest malicious intent on Defendants' part.

the arbitrary, onerous and obstructive actions he took against Plaintiffs . . . .").  To the extent that

the Amended Complaint suggests that Plaintiffs' politically connected neighbors brought

pressure to bear on Defendants, that pressure was similarly geared toward taking "whatever steps

were necessary to get public flood repair monies flowing."  Am. Compl. ¶ 121.  None of these

allegations suggests any ill will—on the part of any party—directed toward Plaintiffs.  *Cf.*

*Gottlieb v. Vill. of Irvington*, 69 F. Supp. 2d 553, 559 (S.D.N.Y. 1999) (suggesting that a

municipality's desire to "accommodate the alleged wishes of neighboring property holders" may

provide the requisite bad faith in a case where the neighbors opposed plaintiffs' specific

project).[15]

Thus, even if Plaintiffs had successfully alleged disparate enforcement relative to others

who were similarly situated, their claim would be dismissed for failure to allege the requisite

bad-faith motive.[16]

### c.   "Class of One"

In order to adequately allege an equal protection claim on a "class of one" theory, a

plaintiff must demonstrate (1) that he was "intentionally treated differently from others similarly

---

[15] Plaintiffs point to Melillo's "targeted misapplication of the 'cumulative substantial improvement' formula" as a further sign of bad-faith motive. Pls.' Mem. of Law in Opp'n at 23.  The problem with this argument, however, is that the pleadings themselves do not suggest that Melillo misapplied the formula, let alone that he did so in a "targeted" or intentional way. All the Amended Complaint says is (1) that a New York State official expressed disagreement with Defendants' calculation and (2) that, at a certain point, Melillo informed Plaintiffs that he had previously given them mistaken information about how a variance would affect their "cumulative damage totals." Am. Compl. ¶¶ 65-66, 84.  The Court is unable to reasonably infer from these statements that Melillo was intentionally miscalculating anything.

[16] Plaintiffs' brief does not make any arguments regarding alleged bad-faith or malice on the part of the Board.  *See* Pls.' Mem. of Law in Opp'n at 23.  The Amended Complaint alleges that, at the initial Board meeting, some Board members were "openly hostile to Plaintiffs' application and publicly criticized the efforts Plaintiffs had undertaken thus far to rebuild their house," and that the Board's tone at the next meeting was "antagonistic." Am. Compl. ¶¶ 87, 99. But Plaintiffs still received their variance, and nothing in the pleadings suggests an inference that the conditions imposed on that variance were the product of any hostility or antagonism the Board may have displayed.

situated," and (2) "that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *see also Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2010) (examining *Olech*'s reasoning and determining that it does not apply to public employment cases).  Stated differently, a plaintiff asserting a "class of one" equal protection claim must allege that the intentional disparate treatment was "wholly arbitrary" or "irrational."  *Aliberti v. Town of Brookhaven*, 876 F. Supp. 2d 153, (E.D.N.Y. 2012) (citing *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001)).[17]

---

[17] Defendants argue that a "class of one" claim cannot be based on discretionary determinations.  *See* Defs.' Mem. of Law in Supp. at 8-12.  In holding that the "class of one" theory is inapplicable in public employment cases, the Supreme Court observed that "[t]o treat employees differently is not to classify them in a way that raises equal protection concerns.  Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship."  *Engquist*, 553 U.S. at 605.  "Post *Engquist*, some courts extrapolated the case's holding to bar equal protection class-of-one claims whenever the government's actions were deemed discretionary, irrespective of whether the plaintiff was a government employee or not."  *Aliberti*, 876 F. Supp. 2d at 162 (collecting cases).  The Second Circuit, however, explicitly held that "*Engquist* does not bar all class-of-one claims involving discretionary state action."  *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010).  *Engquist* typically does not apply in "cases where the government exercises its regulatory power."  *Aliberti*, 876 F. Supp. 2d at 163 (citing *Analytical Diagnostic*, 626 F.3d at 142).  Defendants concede this point but argue that the Court should nevertheless apply *Engquist* given the "highly discretionary and subjective nature of land use decisions."  Defs.' Mem. of Law in Supp. at 10 n.5.  They rely, to a large extent, on language in *Engquist* that uses the issuance of traffic tickets as an example of a discretionary act.  *Id.* at 11 (citing *Engquist*, 553 U.S. at 603-604).  However, in light of *Analytical Diagnostic*, this Court has expressly adopted a contrary approach.  *See Missere v. Gross*, 826 F. Supp. 2d 542, 560 n.13 (S.D.N.Y. 2011) ("The Court will therefore assume that [plaintiff's] class-of-one claim is cognizable in this context, even though, as the Court has already noted, it involves an area of state action—land use regulation—in which the government exercises considerable discretion.").  Since Plaintiffs' "class of one" claim fails in any event, the Court declines to reexamine that approach at present.

Defendants also contend that a "class of one" claim requires a showing of malicious or vindictive intent.  *See* Defs.' Mem. of Law in Supp. at 15-17.  However, "[w]hile the Second Circuit has repeatedly deferred the question of whether *Olech* eliminated the inquiry into defendant's bad faith intent, district courts have generally assumed that it did and allowed a 'class of one' claim to proceed based only on the government's arbitrary conduct."  *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 n.7 (S.D.N.Y. 2008) (citation omitted).  Indeed, one Second Circuit opinion expressly stated that "proof of subjective ill will is not an essential element of a 'class of one' equal protection claim," *Jackson v. Burke*, 256 F.3d 93, 97 (2d Cir. 2001) (per curiam), though a subsequent panel described this statement as *dicta* and declined to resolve the issue.  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 500 (2d Cir. 2001).  The Second Circuit and New York district court cases to which Defendants cite are inapposite, as all but two dealt with selective enforcement claims.  *See* Defs.' Mem. of Law in Opp'n at 16-17.  *Millar v. Ojima*, 354 F. Supp. 2d 220 (E.D.N.Y. 2005), did apply a bad-faith requirement in the "class of one" context, but in doing so it relied on a portion of a Second Circuit opinion that was addressing a selective enforcement claim.  *See id.* at 227-28

While the parties debate the adequacy of the pleadings with respect to the rational basis prong, the Court is unable to reach that issue given the insufficient showing on the "similarly situated" element.  The Second Circuit has observed that "[t]he similarity and equal protection inquiries are . . . virtually one and the same" in "class of one" cases.  *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (per curiam).  In describing the "class of one" similarity standard, the court required a showing that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Id.*  Thus, the Second Circuit has made clear that *both* elements of a "class of one" equal protection claim—intentional disparate treatment *and* lack of rational basis—must be analyzed by comparing the plaintiff to those who are similarly situated.  In other words, the question is not whether there was a legitimate basis for Defendants' specific actions with respect to Plaintiffs' property, but rather whether there was a legitimate basis for the alleged disparities between those actions and the ones directed at surrounding properties.  Without adequate comparators, it is impossible to make this assessment.

Indeed, the parties' briefing on these points further highlights the deficiency in Plaintiffs' identification of comparators.  Plaintiffs' rationality arguments focus on allegations of contradictory instructions regarding regulatory requirements or confusion among the Board

---

(quoting *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005)).  *Citizens Accord, Inc. v. Town of Rochester*, No. 98-CV-0715, 2000 WL 504132 (N.D.N.Y. Apr. 18, 2000), *aff'd*, 29 F. App'x 767 (2d Cir. 2002), discussed vindictive conduct but cited primarily to the Seventh Circuit's decision below in *Olech*; the only citation to the Supreme Court opinion was focused solely on rational basis.  *Id.* at *27.

members who were applying Chapter 186. *See* Pls.' Mem. of Law in Opp'n at 27-28.[18] But such allegations speak to "rationality" only in the sense that they call into question the soundness of Defendants' substantive determinations.  Plaintiffs' equal protection claim, however, is concerned not with how Defendants applied the law to Plaintiffs' property, but rather with Defendants' decision to enforce those laws against them in the first place.  Defendants' argument, meanwhile, merely asserts that the floodplain regulations themselves had rational objectives and that Defendants were acting rationally by pursuing compliance with them.  *See* Defs.' Reply Mem. of Law in Supp. at 7.  But these arguments do not address the alleged decision to *selectively* enforce the regulations.  Neither party confronts that issue.

It is fairly self-evident that, to the extent Defendants decided to step up their enforcement efforts in order to qualify for FEMA flood relief, that motivation provides a rational basis for changing the enforcement policy across the board (*i.e.*, for treating everyone who undertook repairs after the change in policy differently from everyone who had undertaken repairs prior to the change in policy).  That is why, in order to state this particular "class of one" claim, it is essential that Plaintiffs establish an appropriate temporal nexus between themselves and their comparators.  Absent sufficient allegations in this regard, Plaintiffs will be unable to demonstrate that there was no legitimate government purpose supporting Defendants' treatment of their property.

_____

[18] Plaintiffs also proffer an argument about the alleged arbitrariness of the variance conditions. *See* Pls.' Mem. of Law in Opp'n at 27.  As previously discussed, since none of Plaintiffs' neighbors are alleged to have sought a variance, there is no equal protection concern—and thus no relevant rational basis inquiry—at issue with respect to these allegations.

### ii.  Due Process Claims

Plaintiffs' second cause of action alleges substantive due process violations under the Fourteenth Amendment.  Am. Compl. ¶¶ 133-40.  The third cause of action alleges a procedural due process claim under the Fifth and Fourteenth Amendments.[19]  *Id.* ¶¶ 141-48.  In either case, the threshold issue is whether Plaintiffs possessed a valid property interest.  *See Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 427-28 (2d Cir. 2011) (noting that procedural due process analysis first requires a determination as to whether a property interest exists (quoting *Swarthout v. Cooke*, --- U.S. ---, 131 S. Ct. 859, 861 (2011))); *Zahra*, 48 F.3d at 680 ("To state a substantive due process claim, a party must *first* establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit." (emphasis in original) (citing *Brady v. Town of Colchester*, 863 F.2d 205, 211-12 (2d Cir. 1988))).  Because Plaintiffs have failed to plausibly allege the existence of a cognizable property interest, both due process claims must be dismissed.

To possess a federally protected property interest, a person must have a "legitimate claim of entitlement to it."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).  Such a claim does not arise from the Constitution, but rather from an independent source such as state or local law. *See id.*; *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 629 (2d Cir. 1996); *G.I. Home Developing Corp. v. Weis*, No. 07-CV-4115 (DRH), 2009 WL 962696, at *5

---

[19] The basis for Plaintiffs' Fifth Amendment claim is unclear, as there is no allegation of federal action in this case. The Court does note that the Amended Complaint contains multiple references to "takings."  Am. Compl. ¶¶ 147, 156, 164.  To the extent Plaintiffs seek to assert a claim under the Fifth Amendment's Takings Clause, that claim would necessarily be dismissed on ripeness grounds.  As noted above, *Williamson* requires that a party seek just compensation from the state prior to bringing a federal takings claim.  Here, the Amended Complaint is completely silent as to any attempt on the part of Plaintiffs to seek compensation from the state, thus defeating any such claim.

(E.D.N.Y. Mar. 31, 2009). "An abstract need, desire or unilateral expectation is not enough."

*Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002) (citing *Roth*, 408 U.S. at 577).

To the extent Plaintiffs allege a property interest in their building permit, this Court has already confronted and resolved this issue in an analogous case. *See Gottlieb*, 69 F. Supp. 2d at 556. The Court's reasoning in that case is applicable here and explains why Plaintiffs are unable to plausibly allege that they were deprived of a valid property interest in their building permit:

> Plaintiffs apparently want the Court to equate the Village's temporary interference with their right to continue building—because of the stop work order—with a denial or revocation of a building permit. Those two things cannot be equated, however. Under New York law, Plaintiffs, as holders of a building permit showing a non-conforming driveway location, did not have a vested property right (i.e., a clear entitlement, rather than a mere expectation) to build their house in conformity with those plans. Although their site plan—with the driveway in the location they wish to build it in—was approved by the Village, the Village later determined that the site plan was inconsistent with the subdivision plat and had, therefore, been erroneously approved by the Building Inspector. New York courts have repeatedly held that a landowner does not have a vested property right to a building permit issued erroneously by a building inspector, and that there can be no estoppel against the government in such a situation. Therefore, Plaintiffs have not demonstrated that they were deprived of any federally-protected right.

*Gottlieb*, 69 F. Supp. 2d at 556 (citations omitted).

*Gottlieb* was resolved on a motion for summary judgment, such that the Court had the benefit of a fully developed factual record. Ordinarily, there might be a question as to whether Plaintiffs' permit was, in fact, erroneously issued, thus rendering the matter inappropriate for disposition on a 12(b)(6) motion. The problem, however, is that Plaintiffs have not even presented conclusory allegations—let alone the factual allegations required under *Twombly*— allowing the Court to infer that Plaintiffs' repair work was in compliance with Chapter 186. The underlying theory of the case implicitly promotes the opposite inference. Plaintiffs' objections are focused not on the legitimacy of Defendants' actions with respect to their property, but rather

22

with the fact that similar actions were *not* taken with respect to neighboring properties.  The natural implication is that, had Chapter 186 been enforced uniformly, there would have been no basis for a constitutional claim.  If Plaintiffs separately contend that Chapter 186 was *misapplied* with respect to their property in particular, such a contention is not captured in the allegations pled.[20]

The fact that construction was fifty-percent complete at the time Melillo issued the stop work order does not aid Plaintiffs' case.  In *Petruso v. Schlaefer*, 474 F. Supp. 2d 430 (E.D.N.Y. 2007), the Eastern District of New York dismissed a due process claim that rested "primarily on the argument that the near completion of construction gave [p]laintiffs a vested right to the permit under New York State law."  *Id.* at 438.  The court held that the plaintiffs' having completed ninety percent of their project did not alter the outcome, holding that "where a zoning board finds that a permit was issued in error that permit may be revoked, even in cases where construction has taken place."  *Id.* at 433, 438-39.  The Second Circuit not only affirmed this portion of the district court's opinion, but it explicitly adopted the Eastern District's reasoning. *Petruso v. Schlaefer*, 312 F. App'x 397, 400 (2d Cir. 2009) ("Substantially for the reasons stated by the District Court . . ., we conclude that New York law allows for the revocation and/or modification of a building permit issued in error such that plaintiffs cannot establish that they had or have a federally protected property right to the permit.").[21]

---

[20] In their brief, Plaintiffs argue that "[i]t is plausible that Defendant Melillo did not have a valid basis for interfering in Plaintiffs' property interest in their building permit when he issued his verbal order for the Plaintiffs to stop work."  Pls.' Mem. of Law in Opp'n at 29.  Plaintiffs are incorrect:  while on an abstract level it is, of course, *conceivable* that Chapter 186 was improperly applied, nothing in the Amended Complaint suggests that it is *plausible* to draw such an inference in this case.  As *Twombly* and *Iqbal* make clear, the burden is on Plaintiffs to plead allegations that render such an assertion more than merely speculative.  At this point, they have not done so.

[21] It necessarily follows that Plaintiffs cannot claim that they were deprived of a property interest in the money they had already spent on repairs.  *See* Am. Compl. ¶ 138.

Moreover, even if the building permit itself represented a valid property interest, *Gottlieb* makes clear that, because that permit was never actually revoked, any such property interest was never denied.  Indeed, Plaintiffs were granted the variance they required, albeit subject to conditions they perceived to be onerous.  Melillo's alleged instruction that an additional variance would be required from New York State, while presenting a further hurdle to having the stop work order removed, does not amount to a revocation of the underlying permit.  Indeed, the whole purpose behind obtaining a variance is so that work can resume in accordance with that permit.

Plaintiffs also assert a property interest in their home itself.  *See* Am. Compl. ¶¶ 136-37; Pls.' Mem. of Law in Opp'n at 29-30 (discussing Plaintiffs interest in the "use, enjoyment and ownership of their home").  While it is certainly true that Plaintiffs have a property interest in their home, they only assert a "deprivation" of that interest to the extent that they claim Melillo's determinations and the variance conditions had the effect of rendering them unable to afford the remaining repair work.  The state did not directly take Plaintiffs' home away from them, nor did it render the property itself valueless.[22]  Thus, to claim a property interest based solely on their

---

[22] The Amended Complaint states otherwise, alleging that the variance conditions "rendered Plaintiffs' home worthless as any potential subsequent purchaser would be responsible for elevating the house's foundation."  Am. Compl. ¶ 101.  However, this allegation is implausible on its face.

A copy of the resolution adopting the variance and imposing the conditions is attached as Exhibit D to the Declaration of Terry Rice in support of Defendants' motion to dismiss.  Doc. 9 ("Decl.").  Because that resolution and its contents are incorporated by reference into the Amended Complaint, the Court may properly consider them on a 12(b)(6) motion.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).  The condition in question provides that "[a]ny expenditures made to date to remediate damage from flooding events will count toward the future determination of substantial improvements, as defined in Section 186-2."  Decl. Ex. D, at 2.

As the actual text of the resolution makes clear, the Board did not shift the burden of elevating the foundation to the subsequent owner of the home; it merely deferred that burden until the next event triggering a Chapter 186 computation, regardless of who the owner might be at the time.  During the time period at issue, Chapter 186 required homeowners to elevate the foundation of their home if they undertook repairs or incurred damage

24

ownership of the home is effectively to claim that Plaintiffs were entitled to the building permit and to a conditions-free variance. *Cf. DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 131 (2d Cir. 1998) (holding that land ownership alone does not establish a right to a particular zoning status because, if it did, "any owner of zoned land, which presumably includes the vast majority of landowners, would be entitled to assert a claim in federal court alleging a substantive due process violation each time a local governing body rezoned that land under questionable or unfair circumstances"). As discussed, Plaintiffs had no vested right in their permit. The Court thus turns its attention to whether Plaintiffs can claim a property interest in their sought-after variance.

Since the variance itself was granted, Plaintiffs can only allege a plausible property interest if they can demonstrate a clear entitlement to receive that variance without the challenged conditions attached.[23] They cannot. Chapter 186 expressly provides that "the

---

exceeding fifty percent of the home's existing market value. The "cumulative substantial improvement" provision essentially made this a rolling calculation, such that multiple non-substantial improvements within a given time period were aggregated for purposes of determining whether Chapter 186 was triggered. In Plaintiffs' case, their repairs were deemed a "substantial improvement." Therefore, absent a variance, they would have needed to raise their home's foundation if they wanted to continue with their repairs. The variance allowed Plaintiffs to defer that requirement, while the condition clarified that existing repair work would still count toward future "substantial improvement" calculations.

To the extent that this approach had the effect of shifting the burden of elevating the foundation to a potential buyer, that outcome is merely the product of *Plaintiffs'* request that the requirement be waived in this instance. Thus, any consequential reduction in property value cannot properly be attributed to the Board's decision. Since Chapter 186 would have applied to Plaintiffs' property anyway in the absence of a variance, the Court cannot reasonably infer that the Board's actions increased the regulations' effect on Plaintiffs' property value. In other words, since the plain terms of Chapter 186 required Plaintiffs to elevate their foundation once their repairs were deemed "substantial," nothing the *Board* did in enforcing the chapter affected the home's value at all. In any event, even if the conditions did affect the value of the property to an extent, Plaintiffs have provided absolutely no basis for their allegation that the home was rendered completely "worthless."

[23] To the extent Plaintiffs assert a property interest in the $2,000 escrow deposit made in connection with their variance application, the Court is unable to see how Plaintiffs retained an interest in that deposit given that their variance was approved. *See* Am. Compl. ¶¶ 78, 139. There are no allegations suggesting that the funds were not used for their designated purpose—paying the Board's consulting costs—or that any of those monies were

25

Planning Board may attach such conditions to the granting of variances as it deems necessary to further the purposes of this article."  Village Code § 186-6(A)(5).  This broad grant of discretion, which is consistent with the discretion the Board possesses generally with respect to variance applications, defeats any claim to a property interest in a particular form of variance.  *See Zahra*, 48 F.3d at 680 (observing that the "entitlement" analysis "focuses on the extent to which the deciding authority may exercise *discretion* in arriving at a decision" (emphasis in original)).  The imposition of conditions therefore did not deprive Plaintiffs of any legally cognizable property interest.  That those conditions may have "rendered it economically unfeasible for [Plaintiffs] to either repair their home to habitability or sell it without a significant loss," while unfortunate, does not turn otherwise-discretionary state action into an unconstitutional deprivation of due process.  Am. Compl. ¶ 137.[24]

Because Plaintiffs have failed to allege a valid property interest, both their substantive and procedural due process claims are dismissed.

### iii.  *Monell*

Plaintiffs' fourth cause of action asserts a *Monell* claim for municipal liability against the Village.  Am. Compl. ¶¶ 149-56.  However, the Court need not reach the merits of that claim.

---

wrongfully retained.  That Plaintiffs were dissatisfied with the resolution of the variance application does not entitle them to a refund of payments made as part of the application process.

[24] Plaintiffs' brief acknowledges that "the gravamen of Plaintiffs' constitutional claims is that they had a legitimate claim of entitlement to repair their flood damaged house under the same requirements as every other similarly situated homeowner."  Pls. Mem. of Law in Opp'n at 30.  A legal entitlement to equal protection, however, cannot form the basis for a substantive due process claim.  *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))); *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]e have held that where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.").

As the Second Circuit has explained, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original).  When a district court concludes that there is "no underlying constitutional violation," it need not address "the municipal defendants' liability under *Monell*." *Id.*  Because all of Plaintiffs' underlying constitutional claims have been dismissed, their *Monell* claim fails as well.[25]

---

[25] For similar reasons, the Court does not reach the question of whether the Amended Complaint plausibly states a claim for punitive damages, *see* Am. Compl. ¶¶ 169-70, or whether Melillo is entitled to qualified immunity.  *See* Defs.' Mem. of Law in Supp. at 29-31.

## IV.    Conclusion[26]

For the reasons set forth above, Defendants' motion to dismiss is GRANTED.  All

dismissals are without prejudice.[27]  If Plaintiffs wish to file a Second Amended Complaint, they

shall do so by **April 21, 2014**.

The Clerk of the Court is respectfully directed to terminate the motion (Doc. 8).

It is SO ORDERED.

Dated:    March 31, 2014
          New York, New York

                                                    Edgardo Ramos, U.S.D.J.

---

[26] In their brief, Plaintiffs assert that "[f]rom the allegations of the Amended Complaint both a facial or as applied void for vagueness challenge to § 186 can be inferred as every reasonable inference should be drawn in plaintiffs' favor."  Pls.' Mem. of Law in Opp'n at 36 n.13.  The allegations in the pleadings do not come close to asserting a challenge of this nature, and there is no basis upon which one could plausibly be inferred.  Indeed, as discussed, the Amended Complaint does not even plausibly allege that Chapter 186 was improperly applied to Plaintiffs' property, except insofar as Plaintiffs claim it was *not* applied to neighboring properties.  The Court is unable to make the untenable leap from selective enforcement to void for vagueness.

[27] Plaintiffs have expressly requested leave to cure any defects in their pleadings.  Pls.' Mem. of Law in Opp'n at 43.  Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend should be freely granted, and "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

28