UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID WITT and KINUYO GOCHAKU WITT,

                              Plaintiffs,

           – against –

THE VILLAGE OF MAMARONECK and
ROBERT MELILLO, individually and in his
Official Capacity as the Building Inspector,

                              Defendants.

**OPINION AND ORDER**

12-CV-8778 (ER)

RAMOS, D.J.:

        Plaintiffs David Witt and Kinuyo Gochaku Witt (together, "Plaintiffs") bring this action

against the Village of Mamaroneck (the "Village") and Building Inspector Robert Melillo

("Melillo") (collectively, "Defendants") pursuant to 42 U.S.C. § 1983.[1]  The action arises from

the legal requirements Defendants imposed on Plaintiffs in connection with their efforts to repair

their home in the aftermath of Hurricane Irene.  Plaintiffs maintain that similarly situated

homeowners were not subjected to the same treatment, which therefore constitutes a violation of

their equal protection and substantive due process rights under the Fourteenth Amendment.

Plaintiffs also allege a *Monell* claim against the Village.

        On March 31, 2014, this Court dismissed Plaintiffs' claims without prejudice.  *See* Doc.

18.  Accordingly, Plaintiffs amended their complaint, which Defendants again move to dismiss

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.   For the reasons set forth

below, Defendants' motion to dismiss is GRANTED.

_____

[1] Plaintiffs previously alleged claims against the Village of Mamaroneck Planning Board (the "Board").  *See* Am.
Compl.  They have dropped their claims against the Board in their Second Amended Complaint.

## I.    Background[2]

### A.  Factual Background

The Court presumes familiarity with the facts and procedural history of this case, which are detailed in its March 31, 2014 Order (the "March 2014 Order"), granting Defendants' motion to dismiss without prejudice.  *See* Doc. 18.

The thrust of Plaintiffs' action is unaffected by the amended pleading.  Plaintiffs owned a home in the Village of Mamaroneck (the "Village"), which they purchased in April 2009 for $366,500.  Second Amended Complaint ("SAC"), Doc. 19 at ¶¶ 36-38.  Less than three years later, on August 28, 2011, Hurricane Irene caused the Mamaroneck River to overflow, flooding Plaintiffs' home and causing substantial damage.  *Id.* at ¶¶ 44-45, 56.  A series of events that form the basis for the instant action prevented Plaintiffs from successfully completing the necessary repairs.  First, they were initially issued a building permit but subsequently received a verbal stop-work order by Melillo.  *Id.* at ¶ 73.  According to Melillo, the building permit was issued in error because Plaintiffs' repair work constituted a "substantial improvement" under Chapter 186 of the Village Code.[3]  *Id.* at ¶¶ 75, 78.  In relevant part, the code defined "substantial improvement" as follows:

> Any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50% of the market value of the structure before the start of construction of the improvement.  Substantial improvement also means "cumulative substantial improvement."  The term includes structures which

---

[2] The following facts are based on the allegations in the SAC, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[3] Both the Amended Complaint and Plaintiffs' brief refer to "Section 186," but the Court notes that the Village Code designates the subdivision in question "Chapter 186."  The Court will therefore refer to "Chapter 186" throughout this Opinion.  The current version of the Village Code is available at http://ecode360.com/MA0954.

> have incurred substantial damage, regardless of the actual repair
> work performed.[4]

*Id.* at ¶ 79.  If a home was located in a flood plain, sustained "substantial damage," and required repairs that the Building Inspector deemed to be a "cumulative substantial improvement," the owners were required to reconstruct and elevate the foundation unless they obtained a variance from the Village Planning Board ("the Board").[5]  *Id.* at ¶ 80.  Plaintiffs sought a variance, which they were ultimately granted subject to several conditions.  *Id.* at ¶¶ 128, 184.  Most notably, Plaintiffs understand one of the conditions to require any future owner to elevate the house if subsequent repairs are needed within a ten-year period.  *Id.* at ¶ 191.  The end result was that Plaintiffs ran out of money to complete repairs, defaulted on their mortgage, and had foreclosure proceedings brought against them.  *Id.* at ¶¶ 28, 186.  In the meantime, Melillo was issuing building permits to other nearby homeowners without requiring them to comply with Chapter 186.  *Id.* at ¶ 22.

The following facts were not plead in the Amended Complaint ("Am. Compl.") and are drawn solely from the SAC.

First, Plaintiffs provide additional contextual details.  Plaintiffs lived on a block on First Street "lined with 14 modest single family homes all similar in size, design, and value as

---

[4] A "cumulative substantial improvement" is defined by the code as "[a]ny reconstruction, rehabilitation, addition, or other improvement of a structure that equals or exceeds 50% of the market value of the structure at the time of the improvement or repair *when counted cumulatively for 10 years*."  Village Code § 186-2 (emphasis added).  Chapter 186 was amended in September 2012, and the "cumulative substantial improvement" provision was removed.  SAC ¶ 114 n.2.

[5] Chapter 186 provides that "[w]ithin Zone[] . . . AE . . . new construction and substantial improvements shall have the lowest floor (including basement) elevated to or above two feet above the base flood level."  Village Code § 186-5(C).

Plaintiffs'."[6]  *Id*. at ¶ 39.  All of First Street—the street on which Plaintiffs resided—was located in a Federal Emergency Management Agency ("FEMA") designated high risk "AE" special Flood Hazard Area.  *Id*. at ¶ 3.  At the time the dispute arose, Plaintiffs were the only homeowners on the block of mixed race and were the sole residents on their street who were not long-time residents of the Village.[7]  *Id*. at ¶¶ 6, 9.  While Plaintiffs lacked any personal relationships with Village officials or employees, many of their neighbors worked for the Village or were friends with past or present Village officials.  *Id*. at ¶¶ 8, 9.  The SAC identifies three sets of neighbors—one that included a former Village employee, another that were friends with members of the local police department, and a final set that were close family friends of the former Board chairperson.  *Id*. at ¶¶ 95-97.  As a result, Plaintiffs were "vulnerable . . . targets[.]"  *Id*. at ¶ 160.

Second, the SAC further describes Plaintiffs' experience in rebuilding their home in the aftermath of Hurricane Irene vis-à-vis their neighbors.  All twelve homes located on First Street were severely damaged as a result of flooding that occurred when the Mamaroneck River overflowed.[8]  *Id*. at ¶¶ 45, 46.  These homes had also sustained damage from prior unspecified "flooding events" which required extensive repairs.  *Id*. at ¶ 41.  Plaintiffs filed their building permit application on September 29, 2011, within the same one-month time frame that other neighbors on the block filed theirs.  *Id*. at ¶¶ 54-55.  Plaintiffs' contractor estimated that their

---

[6] The Amended Complaint merely stated that Plaintiffs' house was "similar in size, style, and value to *neighboring homes*."  Am. Compl. ¶ 15 (emphasis added).

[7] Plaintiffs previously alleged that Defendants singled them out "as targets for their draconian tactics" because "as young, new residents in the community, Plaintiffs lacked the local ties and political influence of many other homeowners who received more favorable treatment."  Am. Compl. ¶ 120.  This claim is now repeated several times throughout the SAC and pled with greater specificity than before.

[8] Earlier in the SAC, Plaintiffs claim that there were fourteen homes on the same block located on First Street.  SAC ¶ 39.

repair work would cost approximately $115,000 and require eight to ten weeks to complete.  *Id*. at ¶ 63.  Plaintiffs' repair plans included renovations that required spending extra money to mitigate against future flood damage by raising "mechanicals and electrical" above flood levels, along with other structural improvements.  *Id*. at ¶ 64.  Defendants knew that Plaintiffs' neighbors along First Street and Barry Avenue "suffered the same degree of damage to their homes."  *Id*. at ¶¶ 85, 85.  Nonetheless, several "comparably damaged" homes within five hundred feet of Plaintiffs' house were permitted to complete repairs without the Village requiring them to adhere to Chapter 186 requirements.  *Id*. at ¶ 138.

Finally, the SAC contains additional allegations concerning the context in which Chapter 186 was enforced against them.   Plaintiffs claim that (1) "[n]o other homeowners on First Street or in the vicinity" were required to comply with Chapter 186; (2) "[a]ll the other homeowners on First Street were allowed to continue with their repairs and move back into their houses even though Melillo knew that they had all sustained comparable cumulative flood damage in 2007 and 2001[;]" and (3) "[n]or did Melillo impose [Chapter] 186's flood damage prevention requirements on other nearby homes in the AE zone that, even more than Plaintiffs' home, clearly surpassed the 'cumulative substantial improvement threshold for damage[.]"  *Id*. at ¶¶ 19-21.

Melillo allegedly assisted Plaintiffs' neighbors by advising them on how to circumvent Chapter 186 by misrepresenting the actual extent and cost of flood damage repairs on their building permit applications.  *Id*. at ¶ 161.  As a result, these homeowners were allowed to proceed with undocumented and more extensive repairs without being subject to Chapter 186.  *Id*. at ¶ 164.  As to Plaintiffs, Melillo calculated the value of their house using the tax assessor's

valuation, rather than the market value, as required by the regulation.[9]  *Id.* at ¶ 82.  In addition, after the Board granted Plaintiffs a variance with respect to Chapter 186, Melillo informed them that they would not be allowed to recommence work until they obtained a State variance for having a bathroom on the first floor and a washing machine in the basement.  *Id.* at ¶ 187.

Plaintiffs conclude by stating that they have been unable to sell their home because of the condition attached to the variance that any future owner would be required to elevate the house in the event that any future repairs were required within a ten-year period.  *Id.* at ¶ 191.

### B.  Procedural History

Plaintiffs filed suit on December 4, 2012 and amended their Complaint on February 15, 2013.  Docs. 1, 4.  The Amended Complaint consisted of equal protection, substantive due process, and procedural due process claims, along with a *Monell* claim against the Village and various claims for relief under state law.  *See* Am. Compl., Doc. 4.  Defendants filed a motion to dismiss the Amended Complaint on May 31, 2013, Doc. 8, which the Court granted in its entirety on March 31, 2014, subject to the specification that "[a]ll dismissals are without prejudice."[10]  Doc. 18 at 28.

The SAC asserts three causes of action against Defendants, consisting of an equal protection claim, violations of their substantive due process rights, and a *Monell* claim against

---

[9] Plaintiffs claim that "[i[f the improvements were calculated related to 'market value,' the repairs would not have met the "cumulative substantial improvement" threshold."  SAC ¶ 84.  However, they also state that their neighbors' repairs constituted "cumulative substantial improvements," even more so than their own.  *Id.* at ¶ 21.

[10] In responding to Defendants' first motion to dismiss, Plaintiffs withdrew their state law claims.  Pls.' Mem. of Law in Opp'n, Doc. 12 at 43 n.16

the Village.  *See* SAC ¶¶ 194-226.  In their opposition papers, Plaintiffs also allege that Defendants violated their procedural due process rights.  *See* Pls.' Opp., Doc. 32 at 33-37.

## II.   Discussion

### A.   12(b)(6) Motion to Dismiss Standard

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir.1995)).  "[T]he purpose of Federal Rule of Civil Procedure

12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of Plaintiffs' claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

### B. Ripeness

Once again, Defendants argue that Plaintiffs' claims are not ripe because they did not appeal the stop work order or variance to the Planning Board.[11]  Doc. 30 at 5.[12]  The Court rejected this argument in its March 2014 Order when it determined that the finality requirement does not mandate that a party exhaust its administrative remedies prior to bringing a federal claim.  *See* Doc. 18 at 9 (citing *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 192-193 (1985)).  The Court noted that, although "Plaintiffs may not have exhausted every avenue available to them along the way . . . *Williamson* does not demand that they do so."  *Id.* at 10.  "The failure to appeal may have rendered Plaintiffs' claims unripe had they been brought *prior to* having pursued the variance, but there is nothing in the record indicating that the current state of affairs with respect to Plaintiffs' property is anything less than final."  *Id.* (emphasis in original).

---

[11] Chapter 186 provides that the Board "shall hear and decide appeals when it is alleged there is an error in any requirement, decision, or determination made by the local administrator in the enforcement or administration of this article."  Village Code § 186-6(A)(2).  The Building Inspector falls within the definition of "local administrator."  *Id.* at § 186-2.

[12] Given that the Defendants' motion to dismiss and declarations lack page numbers, the Court's citations to them refer to the page numbers reflected on ECF.

Defendants have not asked the Court to reconsider its opinion, nor have they cited any mistakes in its reasoning or an intervening change in the law.  To the extent Defendants base their motion on their argument that Plaintiffs' claims are not ripe, it is denied.

### C.  Fourteenth Amendment Equal Protection

The Equal Protection clause of the Fourteenth Amendment commands that "all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  There are many ways in which a plaintiff may plead intentional discrimination that violates the Equal Protection Clause.  For example, "a plaintiff may claim . . . selective enforcement of the law . . . based upon his or her membership in a particular class, compared with others similarly situated[.]"  *Savino v. Town of Se.*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013) *aff'd*, 572 F. App'x 15 (2d Cir. 2014) (internal citations omitted).  Alternatively, a plaintiff may seek to prove discrimination under a "class of one" analysis, which consists of:  (1) intentional disparate treatment, (2) from other similarly situated individuals, (3) without a rational basis for the difference in treatment, and (4) without otherwise claiming membership in a particular class or group.  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Plaintiffs proceed under both theories.

### i.   "Similarly Situated" Analysis

Both selective enforcement and class of one claims require a showing of similarly situated individuals or groups who were treated differently.  *See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011).

The Court of Appeals has made clear that, in a "class of one" case, "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). That is because, in such cases, similarity "is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (per curiam). A plaintiff is required to show that (1) "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy;" and (2) "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 60 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)).

However, there is disagreement within the Second Circuit regarding the degree of similarity that a plaintiff must show in order to adequately allege an equal protection claim under the selective enforcement theory. *See Mosdos Chofetz Chaim*, 815 F. Supp. 2d at 693-97 (discussing the alternative standards and surveying the disagreement among courts in this Circuit). It is unsettled whether selective enforcement cases require the same high degree of similarity, or whether a "slightly less stringent" standard applies wherein plaintiffs must show that the comparators are "similarly situated in all material respects." *Id.* at 696 (internal quotation marks omitted) (quoting *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008)). As one court put it:

10

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely or necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

*Id*. at 696 (quoting *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002)).

In the March 2014 Order, the Court did not have to decide which standard should be applied because the selective enforcement claim failed to satisfy even the more lenient standard. *See* Doc. 19 at 12-13 n.9.  In the Amended Complaint, Plaintiffs broadly alleged that that their home "was similar in size, style, and value to neighboring homes" and that many of these "similarly sized and valued homes experienced comparable damage" after Hurricane Irene.  Am. Compl. ¶¶ 15, 72.  Although they provided more specific allegations about the costs expended on repairs to three nearby properties, they did not allege that the homes were located in an applicable floodplain or that the repairs exceeded fifty percent of their market value.  *Id*. at ¶¶ 113-115.  Only one property was specifically alleged to have incurred those costs as a result of Hurricane Irene.  *See id*. ¶ 113.  The Court noted that "there is nothing inherently wrongful in Defendants' deciding to respond to external pressures by enforcing existing regulations[.]"  Doc. 19 at 14.  Therefore, "in order to demonstrate that their neighbors were similarly situated in all *material* respects, Plaintiffs must identify comparators who were undertaking repairs concurrently, subsequently, or at least within sufficiently close temporal proximity so as to suggest that a proper comparison may be drawn for purposes of the equal protection analysis." *Id*.  (citing *Mosdos Chofetz Chaim,*, 815 F. Supp. 2d at 698-99) (considering the relative timing

of project approvals as a relevant factor in assessing the adequacy of the pleadings). Furthermore, the Court reasoned that since the pleadings expressly alleged that Plaintiffs' neighbors were not required to pursue a variance, they could not claim disparate treatment based on the *outcome* of their variance.  *Id*. at 15.

Yet again, the SAC fails to allege that any other homeowners were similarly situated in all material respects, let alone establish a high degree of similarity under the more stringent class of one standard.

To begin with, Plaintiffs do not allege that other damaged properties had a similar market value and required the same relative dollar amount of repairs.[13]  Plaintiffs' entire street was a "designated high risk flood zone" subject to Chapter 186.  SAC ¶ 92.  Plaintiffs maintain that the houses on their *block* were "similar in size, design and value as Plaintiffs[,]"  *id*. at ¶ 39, and that all of the houses on their street sustained the same degree of damage from the 2007 and 2011 flooding events.  *Id*. at ¶¶ 85, 87.  Yet, the applicability of Chapter 186 hinges on "the *cost* of any

---

[13] As a preliminary matter, Plaintiffs have cured the prior defect in their Amended Complaint, which fell short of claiming that other similarly-situated homeowners were undertaking repairs within sufficiently close temporal proximity.  The SAC states, "[t]he neighbors repairs were ongoing and at various stages of completion when . . . Melillo interrupted Plaintiffs' repair work with the issurance of a stop work order[.]"  SAC ¶ 90.

In the prior Amended Complaint, however, Plaintiffs alleged that they did not obtain their permit or begin repairs until their neighbors "had already substantially completed the repairs to their flood-damaged homes."  See Am. Compl. ¶¶ 41-42; *see also id*. ¶ 122 (identifying Plaintiffs' "delayed repair schedule" as a factor leading to the alleged disparate treatment).  Defendants argue that the Court should not accept these allegations as true because they contradict Plaintiffs' former pleadings.  Doc. 30 at 2-4.  "[I]n a typical case, a prior inconsistent pleading should not trump the Court's obligation under Rule 12(b)(6) to accept a complaint's allegations as true."  *Palm Beach Strategic Income, LP v. Salzman*, No. 10 Civ. 261 (JS) (AKT), 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011) *aff'd*, 457 F. App'x 40 (2d Cir. 2012) *and aff'd*, 457 F. App'x 40 (2d Cir. 2012).  Nonetheless, some courts have held that "[w]here a 'plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . .  [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the original complaint as true.'"  *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 CIV 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) *aff'd sub nom. Colliton v. Cravath, Swain & Moore LLP*, 356 F. App'x 535 (2d Cir. 2009) (internal citation omitted).  Regardless of whether the Court accepts these new allegations as true, Plaintiffs' equal protection claim fails for the reasons stated above.

reconstruction, rehabilitation, or other improvement" and whether it "equals or exceeds 50% of the *market value* of the structure before the start of construction of the improvement."  Village Code § 186-2 (emphasis added).  Beyond the houses located on their street block, Plaintiffs do not make any allegations with respect to the market value of the other homes identified in the SAC.  More importantly, Plaintiffs admit that they spent more money on their own repairs to *prevent* future flood damage, as opposed to simply repairing the damage caused by Hurricane Irene.  SAC ¶ 63.  Plaintiffs never contend that any of their neighbors similarly went beyond simply repairing the damage to their homes and invested in additional alterations.  In fact, the SAC is silent as to whether the other homeowners on Plaintiffs' block spent the same, or even a similar amount, on repairing their homes.[14]

The Court also notes that Chapter 186 was only one of the reasons Melillo provided for issuing his stop work order.  Plaintiffs admit that Melillo also cited the fact that they failed to file a Flood Development Permit application with their building permit application.[15]  SAC ¶ 78. Moreover, after the Board issued the variance with respect to Chapter 186, Melillo advised Plaintiffs that they would not be permitted to recommence repairs until they obtained a New York State variance for having a bathroom on the first floor or a washing machine in the

---

[14] The SAC references a house located 2.2 miles away at 615 Forest Zone, which underwent $310,000 in renovations.  SAC ¶ 106.  It also identifies a home on 1616 James Street, 0.8 miles away from Plaintiffs' house, which sustained flood damage of reportedly $133,000 in 2011 and $116,000 in 2007.  *Id.* at ¶ 104.  However, although these figures exceed the $115,000 estimated cost of Plaintiffs' repair work, *see id.* at ¶ 63, no information is provided as to the market value of the homes.

[15] Chapter 186 provides that "[i]t shall be unlawful to undertake any development in an area of special flood hazard . . . without a valid floodplain development permit."  Village Code § 186-4(B)(1).  Furthermore, "[t]he local administrator shall issue, or cause to be issued, a stop-work order for any floodplain development found ongoing without a development permit."  *Id.* at § 186-4(D)(6)(a).

basement.  *Id.* at ¶ 187.  Plaintiffs do not allege that their neighbors also did not submit a Flood

Development Permit application, or that they undertook other repairs requiring a state variance.

Finally, as was the case with the Amended Complaint, the fact that Plaintiffs' neighbors

were not required to pursue a variance at all, *see* SAC at ¶ 185, "belies any argument that

similarly situated comparators exist with respect to the allegedly 'unprecedented' variance

conditions."  *See* Doc. 18 at 15; *see also* SAC at ¶¶ 174, 184 (explaining that the variance

conditions "had never been imposed on a homeowner seeking a Section 186 variance prior to

Plaintiffs' application nor has been imposed on any homeowner since").

Since Plaintiffs have failed to allege differential treatment from similarly situated

individuals, their equal protection claim must be dismissed.[16]

### ii.     Selective Enforcement

Even if Plaintiffs had sufficiently alleged that their neighbors were similarly situated,

their selective enforcement claim would once again fail.  In order to state a viable equal

protection claim under the selective enforcement theory, a plaintiff must show that:

> (1) the person, compared with others similarly situated, was selectively treated,
> and (2) the selective treatment was motivated by an intention to discriminate on
> the basis of impermissible considerations, such as race or religion, or to punish or
> inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to
> injure the [plaintiff].

---

[16] The SAC also suggests an alternative explanation for the Village's enforcement of Chapter 186 against Plaintiffs.
It states that Melillo "acknowledged that he knew that Plaintiffs had provided the Village a true and accurate
estimate of the costs of repairs while their neighbors had not."  SAC ¶ 140.  Furthermore, he explained that Plaintiffs
were "being punished for doing the right thing" while their neighbors failed to report the true extent of their repairs.
*Id.* at ¶ 142.  Plaintiffs go on to accuse Melillo of helping their neighbors avoid Chapter 186's requirements by
submitting false information.  *Id.* at ¶¶ 161-165.  Of course, these alternative rationales merely highlight the lack of
similarity between Plaintiffs and the purported comparators.

*Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)).  The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.'"  *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)).

For the first time in this litigation, the SAC makes a point of calling attention to the fact that, when the events at issue took place, Plaintiffs were the only interracial couple on their block.  SAC ¶¶ 9, 27.  It also notes that, Plaintiffs "lacked the personal relationships with Village officials that protected their Neighbors."  *Id.* at ¶ 160.  Taken together, the SAC posits that:

> Melillo transferred his animus to the Plaintiffs who, as new residents of the Village, had no personal ties to Village insiders or decision-makers, and as a young mixed race couple, were convenient targets to serve as his sacrificial lambs in a community where Village affairs were dominated by longtime residents, predominantly white, and many a part of a close knit Italian community.

*Id.* at ¶ 27.

Besides the fact that Plaintiffs have failed to allege the existence of similarly situated homeowners, they also have not shown that "the disparate treatment was *caused by* the impermissible motivation."  *Anderson v. City of New York*, 817 F. Supp. 2d 77, 94-95 (E.D.N.Y. 2011) (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005)) (emphasis in original).  Plaintiffs "must demonstrate that a discriminatory purpose was a 'motivating factor' in the government decision."  *Adler v. Kent Vill. Hous. Co.*, 123 F. Supp. 2d 91, 98 (E.D.N.Y. 2000) (quoting *Estate of Rosenbaum by Plotkin v. City of New York*, 975 F. Supp. 206, 223 (E.D.N.Y. 1997)).  "Discriminatory purpose implies that the decisionmaker selected or reaffirmed a

particular course of action at least in part because of[,] not merely in spite of its adverse effects upon an identifiable group." *Id*. (quoting *Rosenbaum*, 975 F. Supp. at 223).  Throughout the SAC, Plaintiffs contend that the fact that they are a mixed-race couple rendered them vulnerable or convenient targets; however they never claim that they were actually singled out on the basis of their race.  *See* SAC ¶¶ 9, 27.  Furthermore, although the SAC states that "Plaintiffs were targeted . . . because the other homeowners were all longtime Village residents[,]"[17] *id.* at ¶ 94, "such a consideration is not on the same level as race, religion, sex, intent to injure, or a desire to punish plaintiff[s] for exercising [their] constitutional rights."  *Payne v. Huntington Union Free Sch. Dist.*, 101 F. Supp. 2d 116, 119 (E.D.N.Y. 2000) (holding that a plaintiff's claim that she was fired because she was married to the District's superintendent did not constitute a constitutionally impermissible consideration).  Furthermore, the SAC does not allege that Defendants selectively enforced Chapter 186 because of its adverse effects on village newcomers as a group.

Nor do Plaintiffs sufficiently allege that the purported selective treatment was motivated by a malicious or bad-faith intent to injure them.[18]  The SAC states that "[t]he genesis of Melillo's actions arose from his animus towards federal and state officials, and some vocal local residents, who criticized Melillo for being lax in his enforcement of flood damage prevention regulations."  SAC ¶ 26.  As examples of Melillo's "animus" being channeled toward Plaintiffs,

---

[17] Plaintiffs also assert that because their neighbors had personal ties to Village officials, they had access to advice and assistance from Melillo on how to skirt the obligations of Chapter 186 that Plaintiffs did not have.  SAC ¶¶ 161-164.

[18] The SAC does not make any allegations that can be construed as alleged bad-faith or malice on the part of any Defendant other than Melillo.  It alleges that, at the special Board meeting, "the tone of some of the Board was very antagonistic toward Plaintiffs' application [for a variance]."  SAC ¶ 182.  Nonetheless, Plaintiffs still received their variance, and nothing in the pleadings suggests an inference that the conditions imposed on that variance were the product of any hostility or antagonism the Board may have displayed.

16

the SAC broadly cites "the tone and content of his communications with them and the detrimental and unreasonable decisions he was making in regard to their dire situation." *Id*. at ¶ 144.  It also claims that Melillo demonstrated his "animus" at the February 6, 2012 meeting with the Planning Board consultant, in which he stated that Plaintiffs were going to "have a hard time getting the variance" because he was "getting beat up by all these agencies and FEMA[.]"[19] *Id*. at ¶¶ 156.  Plaintiffs conclude "[i]t was clear . . . that Melillo was targeting Plaintiffs and trying to force them to undertake this more expensive and time consuming option of elevating their house for his own self-serving reasons, i.e. to save his job by creating a false impression to federal and state authorities and local critics that he was enforcing Section 186." *Id*. at ¶ 158. Yet, as was the case before, "[n]one of these allegations suggests any ill will—on the part of any party—directed toward Plaintiffs."[20]  Doc. 18 at 17.

Therefore, even if Plaintiffs had adequately alleged selective enforcement relative to others who were similarly situated, their claim would be dismissed for failure to plead an intention to discriminate on the basis of impermissible considerations.[21]

---

[19] Plaintiffs maintain that this gave them "the impression that he was angry that they were attempting to seek a variance rather than amending their plans to elevate their house[.]"  SAC ¶ 157.

[20] Plaintiffs argue that courts often determine whether a plaintiff has adequately alleged intent by "the drawing of favorable inferences based on factual circumstances at the pleading stage, and not a 'smoking gun' statement which attributes improper motive to a municipality."  Doc. 32 at 24.  Nonetheless, while the Court is required to draw all reasonable inferences in Plaintiffs' favor, *Twombly* and *Iqbal* make clear that the burden is on Plaintiffs to plead allegations that render their assertions more than merely speculative.  At this point, they have not done so.

[21] In their papers, Plaintiffs claim that "they exercised their rights to free speech under the First Amendment when they complained about the unequal treatment of their property and to which Melillo responded with retaliatory hostility and by obstructing their variance application."  Doc. 32 at 24.  The SAC simply does not make a single reference to Plaintiffs' First Amendment rights.

### iii.    "Class of One"

In order to adequately allege an equal protection claim on a "class of one" theory, a

plaintiff must demonstrate (1) that he was "intentionally treated differently from others similarly

situated," and (2) "that there is no rational basis for the difference in treatment."  *Vill. of*

*Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *see also Engquist v. Oregon Dep't*

*of Agric.*, 553 U.S. 591 (2010) (examining *Olech*'s reasoning and determining that it does not

apply to public employment cases).  Stated differently, a plaintiff asserting a "class of one" equal

protection claim must allege that the intentional disparate treatment was "wholly arbitrary" or

"irrational."  *Aliberti v. Town of Brookhaven*, 876 F. Supp. 2d 153, (E.D.N.Y. 2012) (citing

*Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001)).[22]  The Second Circuit has

made clear that *both* elements of a "class of one" equal protection claim—intentional disparate

treatment *and* lack of rational basis—must be analyzed by comparing the plaintiff to those who

are similarly situated.  *Neilson*, 409 F.3d at 105.

---

[22] As they did previously, Defendants argue that a "class of one" claim cannot be based on discretionary
determinations.  *See* Doc. 30 at 12-15.  Although the Supreme Court has held the "class of one" theory is
inapplicable in public employment cases that involve the exercise of "broad discretion that typically characterizes
the employer-employee relationship[,]" *Engquist*, 553 U.S. at 605, the Second Circuit, has explicitly held that
"*Engquist* does not bar all class-of-one claims involving discretionary state action."  *Analytical Diagnostic Labs,
Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010).  Courts within this Circuit have adhered to the judgment that
*Engquist* typically does not apply in "cases where the government exercises its regulatory power."  *Aliberti*, 876 F.
Supp. 2d at 163 (citing *Analytical Diagnostic*, 626 F.3d at 142); *see also Missere v. Gross*, 826 F. Supp. 2d 542, 560
n.13 (S.D.N.Y. 2011) ("The Court will therefore assume that [plaintiff's] class-of-one claim is cognizable in this
context, even though, as the Court has already noted, it involves an area of state action—land use regulation—in
which the government exercises considerable discretion.").  In the March 2014 Order, the Court expressly declined
to reexamine this approach, as it does again here.

Defendants have also repeated their previously rejected argument that a "class of one" claim requires a showing of
malicious or vindictive intent.  *See* Doc. 20 at 18-20.  However, "[w]hile the Second Circuit has repeatedly deferred
the question of whether *Olech* eliminated the inquiry into defendant's bad faith intent, district courts have generally
assumed that it did and allowed a 'class of one' claim to proceed based only on the government's arbitrary conduct."
*Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 n.7 (S.D.N.Y. 2008) (citation omitted).  Defendants have not
cited to any change in the law to support their argument.

The Court previously found that, without adequate comparators, it was impossible to determine whether there was a legitimate basis for the alleged disparities between Defendants' specific actions with respect to Plaintiffs' property and the ones directed at surrounding properties. Since Plaintiffs are, yet again, unable to identify materially similar, let alone identical comparators, the Court's analysis cannot proceed any further. The Village was certainly within its right to enforce Chapter 186. The question here is whether there were other local residents besides Plaintiffs whose repairs triggered the regulation's provisions.[23] Although Plaintiffs insist that "other nearby homes in the AE zone . . . clearly surpassed the 'cumulative substantial improvement' threshold[,]" they fail to proffer the necessary combination of facts to support this conclusory statement. *See supra* Part.II.C.i.

In their papers, Plaintiffs rely on several decisions that predate *Ruston*, the case in which the Second Circuit set out the pleading standard for "class of one" claims in light of the Supreme Court's holding in *Iqbal*.[24] *See Ruston*, 610 F.3d at 59. Prior to *Ruston*, plaintiffs alleging class of one claims did not have to plead "actual instances where others have been treated differently for the purposes of equal protection" in order to overcome a motion to dismiss. *DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir. 2003), *abrogated by Ruston*, 610 F.3d at 59. Furthermore,

---

[23] In its March 2014 Order, the Court also noted that "[i]t is fairly self-evident that, to the extent Defendants decided to step up their enforcement efforts in order to qualify for FEMA flood relief, that motivation provides a rational basis for changing the enforcement policy across the board (*i.e.*, for treating everyone who undertook repairs after the change in policy differently from everyone who had undertaken repairs prior to the change in policy)." Doc. 18 at 20. Although the SAC largely cured the prior Amended Complaint's deficiencies in terms of filling in the temporal gap, Plaintiffs still have not sufficiently alleged the existence of similarly situated comparators. *See supra* Part.II.C.i.

[24] Plaintiffs also cite a case in which the plaintiff's class of one claims survived summary judgment. Doc. 32 at 27 (citing *Alfaro v. Labrador*, No. 06-CV-1470 (JS) (WDW), 2009 WL 2525128, at *11 (E.D.N.Y. Aug. 14, 2009)). However, in *Alfaro*, the plaintiff identified other neighboring properties that, like his own, were engaged in similar zoning violations that were not subjected to the same treatment. 2009 WL 2525128, at *10. Here, Plaintiffs have not alleged facts that support an inference that their neighbors spent enough on repairs as to exceed fifty percent of the market value of their homes and trigger Chapter 186. *See supra* Part.II.C.i.

"[f]ederal courts must be wary 'about transforming run-of-the-mill zoning cases into cases of constitutional right.'" *Adam J. v. Vill. of Greenwood Lake*, No. 10-CV-1753 (CS), 2013 WL 3357174, at *9 (S.D.N.Y. July 3, 2013) (citing *Olech*, 528 U .S at 566 (Breyer, J., concurring)).

Given that Plaintiffs have failed to show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves[,]" *Clubside*, 468 F.3d at 159, they cannot sustain an equal protection claim under a "class of one" theory.

### D.  Fourteenth Amendment Substantive Due Process

### i.  Property Interest

In order to sustain a due process claim, Plaintiffs must have possessed a valid property interest.  *See Zahra*, 48 F.3d at 680 ("To state a substantive due process claim, a party must *first* establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit.") (emphasis in original) (citing *Brady v. Town of Colchester*, 863 F.2d 205, 211-12 (2d Cir. 1988)).  Because Plaintiffs have failed to plausibly allege the existence of a cognizable property interest, their due process claim must be dismissed.[25]  To possess a federally protected property interest, a person must have a "legitimate claim of entitlement to it."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Such a claim does not arise from the Constitution, but rather from an independent source such as state or local law. *See id.*; *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 629 (2d Cir. 1996); *G.I. Home Developing Corp. v. Weis*, No. 07-CV-4115 (DRH), 2009 WL

---

[25] Plaintiffs previously alleged a procedural due process claim under the Fifth and Fourteenth Amendments.  Am. Compl. ¶¶ 141-48.  Although Plaintiffs' reply papers maintain that SAC states a procedural due process claim, Doc. 32 at 33-34, no such claim is asserted in the SAC as a separate cause of action.  Therefore, the Court will not consider Plaintiffs' procedural due process arguments.

962696, at *5 (E.D.N.Y. Mar. 31, 2009).  "An abstract need, desire or unilateral expectation is not enough."  *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002) (citing *Roth*, 408 U.S. at 577).

The Court previously dismissed Plaintiffs' due process claims for failure to allege a property interest.  The Court determined that the Plaintiffs did not have a property right in the building permit, which was erroneously issued.  Doc. 18 at 22-23.  It did not make a difference that construction was fifty-percent complete at the time Melillo issued the stop work order.  *Id.* at 23.  Furthermore, even if the building permit constituted a valid property interest, the fact that Plaintiffs were granted a variance and the permit was never actually revoked implies that any such property interest was never denied.  *Id.* at 24.

Plaintiffs have modified their pleadings to allege that the building permit in question was not erroneously issued.[26]  The SAC claims that, in his calculations, Melillo wrongly used the tax assessor's valuation of their home rather than "market value," as required by Chapter 186.  SAC ¶ 208.  As a result, "Melillo's actions denied Plaintiffs their protected property interest in a validly issued building permit," *id.* at ¶ 209, because "[i]f the improvements were calculated related to 'market value,' the repairs would not have met the 'cumulative substantial improvement' threshold."  *Id.* at ¶ 84.  However, the SAC also contradicts itself by suggesting that Plaintiffs' repairs did in fact constitute a cumulative substantial improvement, stating  "other nearby homes in the AE zone . . . *even more than Plaintiffs' home*, clearly surpassed the 'cumulative substantial improvement' threshold for damage sustained over a 10 year period[.]"

---

[26] Chapter 186 provides that "[t]he Planning Board shall hear and decide appeals when it is alleged there is an error in any requirement, decision, or determination made by the local administrator."  Village Code § 186-6(A)(2).  Plaintiffs never allege in either the SAC or their papers that they challenged Melillo's calculations in front of the Board.

*Id.* at ¶ 21 (emphasis added).  The Court need not attempt to resolve these inconsistencies because Plaintiffs still have not alleged that their building permit was revoked.[27]  As was the case before, "Melillo's alleged instruction that an additional variance would be required from New York State, while presenting a further hurdle to having the stop work order removed, does not amount to a revocation of the underlying permit."  Doc. 18 at 24.

In its March 2014 Order, the Court also found that Plaintiffs did not allege a deprivation of their property interest in their home.  Doc. 18 at 24.  Notably, Defendants' actions "did not directly take Plaintiffs' home away from them, nor did [they] render the property itself valueless."  *Id.*  Once again, Plaintiffs claim that they were deprived of their property interest in their home to the extent variance conditions had the effect of rendering them unable to afford the remaining repair work.  *See id.*; *see also* SAC ¶ 186 ("By the time the Planning Board made a final decision in February 2012 regarding the variance application, Plaintiffs had run out of money to repair their home and to pay their mortgage.").  Plaintiffs further contend that they are unable to sell their home because of the condition placed on the issuance of the variance that any future owner would be required to elevate the house if any subsequent repairs were required within a ten-year period.[28]  SAC ¶ 191.  However, the Board did not shift the burden of elevating the foundation to the subsequent owner of the home; it merely deferred that burden until the next

---

[27] Plaintiffs argue in their opposition papers that the building permit was constructively revoked when Melillo issued his stop work order, "which set in sequence a series of events that rendered the Plaintiffs' expenditures and improvements, and ultimately their home, valueless to them."  Doc. 32 at 30-31. Specifically, they maintain that they cannot afford to repair their home and have been unable to find a buyer. SAC ¶¶ 186, 191.  However, Plaintiffs are conflating the issuance of a building permit—which granted them permission from the Village to undertake repairs—with their own financial ability to act on the building permit.

[28] Plaintiffs previously alleged that the variance conditions "rendered Plaintiffs' home worthless as any potential subsequent purchaser would be responsible for elevating the house's foundation."  Am. Compl. ¶ 101.  The Court found this allegation to be implausible on its face.  Doc. 18 at 25-26 n.22.

event triggering a Chapter 186 computation, regardless of who the owner might be at the time.[29]

Regardless, through these allegations, Plaintiffs are once again essentially alleging that they were entitled to the building permit and to a conditions-free variance.  Doc. 18 at 25 (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 131 (2d Cir. 1998)) (holding that land ownership alone does not establish a right to a particular zoning status because, if it did, "any owner of zoned land, which presumably includes the vast majority of landowners, would be entitled to assert a claim in federal court alleging a substantive due process violation each time a local governing body rezoned that land under questionable or unfair circumstances").  They have not effectively alleged a property interest in their home independent of the property interest they claim to have in the building permit and a conditions-free variance.[30]

Since the Court has found that Plaintiffs have not alleged a deprivation of any property interest they may have had in the building permit, the question is whether they have a property interest in a variance without the challenged conditions attached.  In order to establish a constitutionally cognizable property interest, Plaintiffs must demonstrate that they have a "'clear entitlement' to the approval sought from the government official or administrative body." *Villager Pond*, 56 F.3d at 378 (quoting *Walz v. Town of Smithtown*, 46 F.3d 162, 168 (2d Cir. 1995)).  Whether an entitlement is "clear" depends on the extent to which the authority has the

_____

[29] A copy of the resolution adopting the variance and imposing the conditions is attached as Exhibit D to the Declaration of Terry Rice in support of Defendants' motion to dismiss.  Doc. 29 (" Rice Decl.").  Because that resolution and its contents are incorporated by reference into the Amended Complaint, the Court may properly consider it on a 12(b)(6) motion.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).  The condition in question provides that "[a]ny expenditures made to date to remediate damage from flooding events will count toward the future determination of substantial improvements, as defined in Section 186-2."  Rice Decl., Ex. D at 2.

[30] In their papers, Plaintiffs maintain that they have a property interest in the money they spent on repairs and expenses they incurred while they were unable to inhabit their home.  Doc. 32 at 29.  However, the SAC only alleges a property interest in the $50,000 Plaintiffs spent on repairing their home.  SAC ¶ 215.  Since the value of repairs is presumably reflected in the overall value of the home, there is no palpable difference between this and their claim to a property interest in the house itself.

power to exercise discretion.  *Id.*  "A clear entitlement, and, in turn, a constitutionally protected

property interest, exists only when 'the discretion of the issuing agency is so narrowly

circumscribed that approval of a proper application is virtually assured.'"  *Id.*  (quoting *RRI*

*Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989)).  It is well-settled

that zoning boards have discretion in granting or denying variances.  *See Tomlins v. Vill. of*

*Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 369 (S.D.N.Y. 2011) (citing

*Lamar Adver. of Penn. LLC v. Pitman,* 573 F.Supp.2d 700, 707 (N.D.N.Y. 2008)) ("It is well

established under New York law that '[l]ocal zoning boards have broad discretion in considering

applications for variances[.]'").  As this Court noted in the March 2014 Order, Chapter 186

expressly provides that "the Planning Board *may* attach such conditions to the granting of

variances as it deems necessary to further the purposes of this article."[31]  Village Code § 186-

6(A)(5) (emphasis added).  Thus, for the same reasons the Court provided before, Plaintiffs do

not have a cognizable property interest in a variance free of any conditions.[32]

     The Court also notes that, in a case such as this that involves a substantive due process

claim implicating local land-use management, "the Second Circuit has been 'mindful of the

general proscription that federal courts should not become zoning boards of appeal to review

---

[31] Defendants also argue that the issuance of a stop-work order is a discretionary determination.  Doc. 20 at 25 n.6.
However, the language of Chapter 186 suggests otherwise, as it provides "[t]he local administrator shall issue, or
cause to be issued, a stop-work order for any floodplain development found noncompliant with the provisions of this
article."  Village Code § 186-4(D)(6)(b).

[32] The SAC alleges that Defendants deprived Plaintiffs of the $2,000 escrow deposit they were required to make in
connection with their variance application to cover the Board's consultant fees.  SAC ¶ 216.  As the Court
previously noted, Plaintiffs did not retain an interest in that deposit because their variance was approved.  Doc. 18 at
25-26 n.25.  Once again, "[t]here are no allegations suggesting that the funds were not used for their designated
purpose—paying the Board's consulting costs—or that any of those monies were wrongfully retained."  *Id.*
Plaintiffs are not entitled to a refund of payments made as part of the application process simply because they are
dissatisfied with the resolution of the variance application.

nonconstitutional land [-]use determinations by the [C]ircuit's many local legislative and administrative agencies." *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 705 (S.D.N.Y. 2011) (alterations in original) (quoting *Zahra*, 48 F.3d at 679).

### ii.    Deprivation of a Property Interest

Even if Plaintiffs had carried their burden of establishing the deprivation of a cognizable property interest, it is doubtful that Defendants' acts against their land were "'arbitrary,' 'conscience-shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'"[33] *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)).  "Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with no legitimate reason for its decision." *Ahmed v. Town of Oyster Bay*, 7 F.Supp.3d 245, 259 (E.D.N.Y. Mar. 18, 2014) (quoting *Southview Associates, Ltd. v. Bongartz*, 980 F.2d 84, 102 (2d Cir. 1992)).  "[T]he Second Circuit has also held 'numerous times' that 'substantive due process does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit[;] [its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.'" *TZ Manor, LLC v. Daines*, 815 F. Supp. 2d 726, 746 (S.D.N.Y. 2011) *aff'd*, 503 F. App'x 82 (2d Cir. 2012) (citing *Harlen Associates v. Inc. Vill. of Mineola*, 273 F.3d 494, 505 (2d Cir. 2001)) (alternations in original).

Under Chapter 186, a homeowner may appeal the application of Chapter 186 by the building inspector to the Board.  Village Code § 186-6(A)(2).  In turn, "[t]hose aggrieved by the

---

[33] Nor have Plaintiffs alleged that Defendants were motivated by racial animus.  *See supra* Part II.C.ii.

decision of the Planning Board may appeal such decision to the Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules." *Id.* at § 186-6(A)(3).  Therefore, to the extent that Plaintiffs thought that Chapter 186 was inapplicable, they could have pursued their grievances in state court.  Furthermore, throughout the SAC, Plaintiffs allude to the fact that Defendants' enforcement of Chapter 186 was in response to pressure from the FEMA to enforce flood regulations.  SAC ¶¶ 156, 158, 165.  They also concede that Melillo issued a stop work order, in part, because Plaintiffs had failed to file a Flood Development Permit, as required by Chapter 186.  *Id.* at ¶ 78, *see also* Village Code §§ 186-4(B)(1); 186-4(D)(a).  To the extent that Defendants genuinely believed that Plaintiffs were subject to Chapter 186, they were within their right to enforce it.

Therefore, Plaintiffs' substantive due process claim is dismissed.

### E.   *Monell* Claim

A municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  A § 1983 claim can only be brought against a municipality if the action that is alleged to be unconstitutional was the result of an official policy or custom.  *Id.* at 690-91.  Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403 (1997); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell*, 436 U.S. at 692)).

A *Monell* claim cannot lie absent an underlying constitutional violation.  *Bolden v. Cnty.*

26

*of Sullivan*, 523 Fed. Appx. 832, 834 (2d Cir. 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct.") (citing *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original).  Since Plaintiffs have not established a constitutional violation, their *Monell* claim also fails.[34]

## III.    Conclusion

For the reasons set forth above, Defendants' motion to dismiss is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 28, and to close the case.


It is SO ORDERED.


Dated:    March 27, 2015
          New York, New York

Edgardo Ramos, U.S.D.J.

---

[34] For similar reasons, the Court does not reach the question of whether the SAC plausibly states a claim for punitive damages, *see* SAC ¶ 227, or whether Melillo is entitled to qualified immunity.  *See* Doc. 30 at 33-35.